24-2654 May it please the Court, Nathan Holcomb for Appellant Rebecca Donner. This appeal calls for this Court to clarify the scope of its holding in Bessalon Van Lines v. Walker and specifically to clarify whether it's the case that activity related to distribution of defamatory material is excluded from the jurisdictional analysis under CPLR 302A1, whether the research, drafting, or editing of defamatory content in New York is necessary for New York jurisdiction as the District Court held, and whether activities in New York related to the distribution of defamatory material can support jurisdiction provided that those activities involve something more than the defendant's utterance of a defamatory statement in the State or distribution of some defamatory material into the State. I'd like to focus on the facts of Bessalon Van Lines and the reasoning in Bessalon Van Lines. Are you asking us to disagree with Bessalon Van Lines or to narrow it or to broaden it? I'm asking the Court to clarify the scope of its holding in Bessalon Van Lines. I disagree with the District Court's interpretation of Bessalon Van Lines and with my colleagues' interpretation of Bessalon Van Lines. I don't think it's necessary to overrule Bessalon Van Lines to accept the argument that I'm advancing on Helen's behalf. And how so? How would that not overrule that case? That case is very specific to defamation lawsuits. Yes. It's specific to defamation lawsuits, and it was decided based upon the facts that were presented to this Court. And those facts were that the defendant was an individual residing in Iowa. He was running a non-for-profit website from his home that provided comments about moving companies. And he made a comment on his website about the plaintiff, Bessalon Van Lines, in that case. There was a portion of his website that was designed for accepting donations. And that's what this Court said was the interactive portion of the website. And the Court said that there wasn't a relationship between the interactivity of the portion of the website that was for accepting donations and the claim, which was based on just posting defamatory statements that could be accessed anywhere in the world where the Internet is available, and that obviously includes New York. And what the Court said was that merely making a defamatory utterance or distributing some defamatory material into New York isn't enough. There needs to be something more. But it never said that activities related to distribution could never constitute a transaction of business that established as long-arm jurisdiction under the CPLR. And I think it's important to note the New York cases that Bessalon Van Lines cited. We're here ultimately interpreting the New York statute as the first issue on which the District Court decided. And this Court cited the New York cases applying that statute, including Sovic v. Healing Network from the Fourth Department. Now, that was a case that was dealing with an allegedly defamatory letter. And in Sovic, the Fourth Department said, Plaintiffs have made a sufficient start in demonstrating that facts may exist to establish that solicitation of funds by dissemination of a letter to members of the Institute constitutes the transaction of business under CPLR 302A1. So there's precedent from the Fourth Department clearly allowing that distribution of defamatory material within the State can constitute a transaction of business under CPLR 302A1. But hasn't the New York Court of Appeals said that when it comes to defamation claims, because of the First Amendment implications involved, the standard is different and a little bit more narrow? Yes, it has. So, you know, it's great that the Fourth Department has decided one way, but when the New York Court of Appeals has decided something else, isn't that what we should follow? What this court in a diversity case is doing is predicting how the New York Court of Appeals would rule. So, yes. And both the New York courts and this court has acknowledged that there's a difference in defamation cases. Best Bandlines addressed the single act or single occurrence rule that normally applies under CPLR 302A. And it said that a single defamatory utterance is not sufficient for jurisdiction. That's clear under the carve-outs in CPLR 302. And uttering a defamatory utterance outside of the State that has effects in New York is not sufficient. So what is sufficient here? What is sufficient here is purposeful transactions of business, which is that is the test that the Court of Appeals laid down in SPCA. So, but is this the Spiegel Plus or is this the third-party distributor of the hard copy magazines that you're focused on? Both. So, first, this isn't a case where somebody just is passing through New York, makes one comment, and that's the basis for the claim. It isn't a case where there's one letter that's sent into New York that's the basis for the claim. In advance of the article that's at issue here, Der Spiegel chose to do business in New York. It chose to purposely avail itself of the privilege of doing business in New York by using a facility in Buffalo. It used a third-party distributor to use the facility in Buffalo to distribute, right? Isn't there another party in between Der Spiegel and the Buffalo office? Yes, there is not privity of contract, although under U.S. postal regulations, it is the publisher of the material that is required to maintain a known office of distribution in New York in order to obtain the favorable media rates. So, here, Der Spiegel, there's a contractual intermediary IPS between Data Media and Der Spiegel, but the known office of publication in Buffalo is Der Spiegel's known office of publication. They made that choice. They advertise it on their website, and that is a choice, a purposeful choice to do business in New York and to do it in an ongoing way. It's not a single act. It's a sustained course of business in New York. And the same applies to the Spiegel Plus website, which was advertised, promoted, for United States users who speak German and are interested in German news and culture. That was also a purposeful and sustained... But, again, is an interactive website, the use of an interactive website, sufficient to confer jurisdiction in New York in a defamation case? I understand it may be different in a different type of case, like American Doll or some other products being brought into the United States. But in a defamation case, hasn't, again, the New York Court of Appeals, that we're sort of bound to follow, said, in a defamation case, the use of the interactive website is not sufficient? The New York Court of Appeals has never said, acts related to distribution of defamatory material cannot suffice for a transaction of business under the CPLR. What the New York... Is it any transaction or something more than that to think that is necessary? In light of what the genesis of this was, and that was New York Times versus Sullivan, according to the advisory committee. Yes, that's correct. It's a purposeful transaction of business, and the courts have referred to it being sustained in some way. As this court... Isn't it the case that, from a subscriber standpoint, that only one one-hundredth of one percent of the subscribers to Der Spiegel live in New York? It's a small percentage. Seventy out of what? Seventy out of six-hundred thousand? It's a small percentage. I'd say that's in the teeny area, as opposed to small. Wouldn't you? Seventy out of six-hundred thousand? I won't disagree with the characterization of it as teeny. What I think... So, you think that 70... Excuse me. You think that distributing Der Spiegel to 70 people in New York is transacting business, when Der Spiegel is distributing it to 600,000 people elsewhere? Yes, and... So, the rule that comes from this is transacting business, is if you do business for one one-hundredth of one percent, one one-hundredth of one percent of your business is in New York, that's transacting business. You think that's the rule that comes from this? I think the rule that comes from this is if the transaction... ...is if the transaction of business is purposeful. I'm sure it's purposeful. I'm sure they'd love having 70 people. I'm sure they'd love to have more. But I don't think purposeful is in the eye of the company. Is it in the eye of the state and the courts, so that there's some kind of meaningful standard that we can use to employ to make this decision? It is, and I think that that goes to a key point, which is that, you know, both for the due process analysis, which as this court has said, overlaps significantly... What was the percentage of the New York Times distribution in Montgomery, Alabama, at the time that ad was run in the New York Times, that proved to be the basis for the New York Times was solid? Do you know? I don't know the percentage. Six times higher. It was six times higher. And the advisory committee, when it revamped the CPLR, specifically mentioned that case in terms of drawing attention and accepting out the defamation claims with regard to the statute. Yes. So doesn't that hold a bit of pause there? That is the origin of that provision in the CPLR. I think also ironically, the New York Times had done research and editing related to the content that was at issue in New York Times v. Sullivan. So a rule that there needs to have been research, editing of defamatory content in the state would diverge from the historical origin of the CPLR. Now, I think it is, as Your Honor has alluded to, it is a focus on the defendant here. And I think that is correct because what is the basis for jurisdiction is the defendant's purposeful transaction of business. And what Der Spiegel decided to do was to distribute its print copy magazines in the United States through a facility in New York, and it decided to target online users in the United States. On the online users, with the Senate Chair's indulgence, just that since you mentioned it, there were 112 page views in New York from the online, right? That is what the declaration submitted by the defendant says. I have no reason to doubt that that's the case. Out of 530 million? Correct. It is a small percentage. But when you're a global media company targeting a global audience, the percentage of business in many places that you have purposely targeted to do business will be small. Now, that doesn't mean that a plaintiff cannot elect to sue. But then if we accept your premise, the defendant can be hauled into court and expected to be hauled into court anywhere in the world. And we should ignore the potential chilling effect on First Amendment. The defendant has not established a known office of publication under United States Postal Service regulations anywhere in the world other than Buffalo, New York. It advertises that facility on its website. You said they delivered their magazine through their Buffalo office, but they didn't deliver the magazine, right? The third party that they contracted with to contract with media delivered the magazine. So you're not saying that physically they were leasing space and delivering this product, this magazine, from that space, are you? They were doing so through an agent and a critter. But to be clear, is your claim that they did this through their Buffalo office because they listed an address with the Postal Service, is that your claim? They listed and used that facility in Buffalo through an agent pursuant to a contractual arrangement that they had made. And Croyder says that there can be jurisdiction under CPLR 302 based on activities that are conducted through an agent. All right. Thank you, counsel. We'll see you for your rebuttal. We'll hear now from Attorney McNamara. May it please the court, Elizabeth McNamara for the dare speak all defendants. Appellant has not identified a single defamation case from this court or the New York courts that found personal jurisdiction on comparable facts that exist here. The controlling law and the controlling facts are not in dispute. And because the law and the facts point in only one direction, that there was no personal jurisdiction over the dare speak all defendants, we ask this court to affirm the well-reasoned decision below. Now, I noted at the outset that my adversary suggested that there need to be clarification or modification of the leading Second Circuit case, Best Van Lines. And I want to assure the court that we don't see that there needs to be any clarification or modification. Best Van Lines very clearly and expressly found following New York law on page 248 of its decision that when the defamatory publication itself constitutes the alleged transaction of business for the purposes of Section 302A1, more than the distribution of a libelous statement must be made within the state to establish long-arm jurisdiction over the person distributing it. That is the necessity that there be something more. There was never... So, your opponent is saying there is something more. There's this Buffalo office that's listed with the Postal Service as the known office of publication and that the magazines were distributed through that office. What's your response to that? That is just mere distribution, Your Honor. That's all that's going on with the Postal Office. It's distribution into the state, period. And as pointed out by Judge Wesley, it's a strikingly de minimis amount of distribution. So, even if you apply the due process analysis of Keaton, for example, where there are 10,000 to 15,000 copies per month of the publication going into New Hampshire, here we have a very tiny, tiny amount of publication coming out of that office. And what I think the appellant is ignoring here is the critical component to transacting business. There must be more than transacting business. You must establish that the claim arises out of that transacting business, and there has to be a substantial nexus between the claim and the transacting of business in New York. And here, there is nothing about the article at issue that concerns New York. It was published only in the German language. It concerned a German edition of a book where the appellant had contracted independently in Germany to publish the book. It concerned the resistance in Nazi Germany. Absolutely nothing about New York. And the plaintiff was even interviewed for the article in Germany, and the primary source exists in Germany for the various statements at issue. It's not simply that there is no writing, editing, or any other actions concerning the article that occurred in New York, which is true. But there is nothing about this article that indicates that it was targeted at New Yorkers in any shape or form, which is required to find personal jurisdiction. The nature of the article simply did not connect with New York. And I want to turn to the website, if I may, because the plaintiff has put considerable, I think, emphasis on the fact that the website is there and that there are subscriptions and that there's some interactivity. But that, again, is not sufficient, and I want to make a few points, if I may, about that. First, I think it's highly noteworthy that the website, you do not subscribe to this website as a New Yorker. It is not targeting New Yorkers. It is targeting you subscribe, if you happen to reside in New York, as a United States resident. So there it just underscores the lack of targeting of New York in any kind of specificity. Second of all, there's no direct nexus between any subscription that is acquired and the article here. Again, there was a de minimis, tiniest amount of distribution or downloading. I want to follow up on that. Sometimes when you hit a paywall on the Internet, you hit it and it says, hey, wouldn't you love to subscribe so you could read all our great articles? And some of them say, hey, for $1.99, you can read this article. Which way does Spiegel Plus work? I think, Your Honor, I don't frankly know. Or is that not in the record? It's not in the record, and I don't frankly know which way it works. There's no claim here that the 112, I can't remember how many Judge Wesley pointed out, however many folks viewed this page in the U.S. or in New York, that those folks did so, that they signed up for Spiegel Plus in order to view this article. No, there's no evidence to that effect, Your Honor. And I want to note on that, I think it's an important point that Your Honor raises, which is the paywall. The reason of the First Amendment concerns that underlay the heightened standard for personal jurisdiction in New York law was the fact that when it came to websites, for example, the mere distribution of an article or a publication would subject, as Your Honor pointed out, to publications, publishers, to jurisdiction in any and all publications. If you interject the paywall component, as we all now are familiar, that is becoming ubiquitous. And most publications, or many at any rate, require contributions, payments in order to achieve. So you would, in effect, be doing the exact same thing of subjecting them to jurisdiction in any and all states. Let me ask a slightly different question. You said when someone signs up to receive electronically this magazine, that they do so as a U.S. citizen, not as a New York resident. There are some companies operating interactive websites out of the country that will limit a purchaser. So a pop-up will come up and say, if you live in New York, we don't provide this service in New York. So sort of a block to particular states, because they don't want their product going into that particular state. Is that, and it may not be in the record, but does the Dear Spiegel website follow that model? Not to my knowledge, Your Honor. Not that I'm aware of. And, in fact, I'm not even aware, I mean, maybe you know more than I on this subject, but I wasn't aware that foreign publications do not allow their publications to go into specific states. I'm familiar with the opposite, because of the lesser First Amendment protections. To be clear, it's not in the connection of First Amendment publications, but it is in the connection of products, because they don't want to be sued in a particular state. So they'll only sell the product in a different state, and that has happened. To my knowledge, that is not at all what's going on with Dear Spiegel. And so we would submit, Your Honors, that whether you look at the data media or you look at the interactive website, neither we submit would constitute sufficient transaction of business in New York in order to subject it to jurisdiction. But even if you found that either or both constituted transacting business under the New York statute, you still would, we submit, affirm the decision below, because the cause of action does not arise out of those transactions. They are simply, there's too much of an attenuated connection. It's comparable, we would submit, to the leading court of appeals decision, the SPCA case, where there was real actions in New York, and the defendant had traveled to New York, had made contributions to the SPCA in New York, and then went back to Vermont and posted something on a website about the SPCA. Then that posting on the website was targeted to the United States in generally, and not specific to New York. And there, the court of appeals ruled that that was not sufficient to establish that the cause of action arose out of any transactions that occurred in New York. So we would submit, Your Honor, that even if you were to conclude, we don't agree you should, but that if you were to conclude that there was some transaction of business in New York, you still should affirm, we argue, because the cause of action here simply does not arise out of those transactions. The article at issue here had absolutely nothing to do with New York, and was in no way targeting New York. So we ask this court to affirm the decision below on those grounds, or any of the alternate grounds that we've put forth in our papers. Thank you very much. If you have any other questions, I'm happy to answer. Thank you, counsel. We'll hear again from Mr. Holcomb. Both this court and the New York courts have emphasized that it's the quality, not the quantity, of contacts that matter. This court said that in the American Girl case that cited New York Court of Appeals precedent. There's Fishberg v. Dossett and Paterno. The New York Court of Appeals has repeatedly said that. Now, and I think that goes to the point that Judge Wesley raised about, well, the percentage is small. And I'm not going to dispute that that's the case. It's obviously true. But I'd like to go back to the point that it is the purposeful and sustained transaction of business in New York that is the test for personal jurisdiction. And I think that is borne out by the reasoning in Keaton, which was the leading case that I think my colleague cited. And Judge Wesley, as you noted, it's what makes the difference as to the number of magazines or a number of online content. That's the behavior of Der Spiegel's prospective customers. Prior to knowing how many people are going to buy its product, it had made a decision purposefully to distribute that product through New York to target the United States. And for better or for worse, there is more of a market for the kind of content that Hustler produces in New Hampshire than there is in New York for content about German news and culture in the German language. But there is a market which Der Spiegel purposefully targeted. And that's clear from the fact that on the website, and this is contained in our pleading, on the website when you select for Der Spiegel Plus subscription, the country that you're accessing the content from, you can select the United States, but it's vereinigte Staaten in German. Your argument, I mean, defamation specifically mentioned and excluded from when the act occurs in New York by the statute, correct?  It has to arise out of the transaction of business within New York. Correct. And so it's clear that for some reason defamation was singled out and could only be New York and only assert jurisdiction over it when someone transacts business in New York. It's not any business. It's transacts business in New York, right? Correct. Transacts business in New York, and that is... But there has to be purposeful business activity within New York, your term, and then the cause of action must arise out of that purposeful business activity. And that is the carve-outs for defamation are... If it's distribution, then we may have to measure the purposeful distribution qua purposeful distribution elsewhere. Where else is Der Spiegel, right? I would disagree that for distribution to be purposeful in any given jurisdiction, the percentage of distribution has to be a large percentage of the overall distribution. But I do think that there's a difference between minuscule and 15% or 20% or something less than that. I mean, what I'm concerned with is what's the rule that comes out of this? And so if someone's in the New York market and won 100th of 1% of the time, and a cause of action arises out of that, that's transacting business in New York. I mean, that's an interesting rule that you're... And that's your rule, is it not? That if there's purposeful sustained transaction of business and the claim arises out of that purposeful sustained transaction of business, yes. Then it would be one transaction if it's purposeful, is that it? If this court, if it's one defamatory statement, just an utterance, no. One issue of Der Spiegel that contains a defamatory story that's purposely sold in New York. Because you're hitching your starter purposeful activity. And that's what I'm trying to test the premise of. And I apologize. I'll let you finish on your last thought if the Senate chair will do this. But for some reason, you think it's magical if it's purposeful. And I beg to differ with you. That's my point. Purposeful and sustained, and that emphasis appears in the cases. And if I could just make one final point. Sure. If this court does make it a quantity test, then it is not going to be clear what the rule is. Unless there's a formula that a prospective distributor of content can plug in and say, well, this is my international distribution. These are all the jurisdictions. Some of those jurisdictions have federal systems. Some of them don't. Germany and the United States have federal systems. How to figure out what the percentage is, where you draw the line, that's a very difficult test to apply. It's a much less difficult test whether there's purposeful and sustained transactions of business. And we've alleged that here through the known Office of Publication in Buffalo and the Der Spiegel Plus website accompanied by a dedicated U.S. sales contact. Great. All right. Thank you, counsel. Thank you both for your arguments. We will take the matter under advisement. We'll move next to the matters of United States v. Ben Yohannan and United States v. Loreano. Case numbers are 24-1573 and 24-1586. And let's see. We're going to start with Mr. Yonella, I believe, for Mr. Ben Yohannan and Mr. Bachrach then for Mr. Loreano. All right. Make sure I've got everybody designated for the right people they're speaking for. And, sir, I think you have seven minutes and you've reserved two minutes for rebuttal. Yes, Your Honor. All right. We'll hear from you when you're ready. The 120-month sentence opposed upon my client by Judge Lyman was substantively unreasonable and it should be vacated even under the deferential abuse of discretion standard. It's shockingly high. Now, the guidelines sentence in this case was 84 months. So let's talk about the guidelines in this case. The guidelines recommendation is just a number, right? Yes. It's 924C. Yes. And so it's unusual. There's no range and it doesn't take into account aggravating or mitigating factors, right? It doesn't take leader or organizer. It doesn't take into account various harms, right? It doesn't take into account criminal history category. Right. It's just a number, just a flat seven-year man-min. So it's an 84-month guideline. Yes, Your Honor. How should we, if we should, should we think about that differently? Because I'll tell you the truth. I said, oh, I've got a substantive reasonableness challenge where they actually, these two sentences are substantially more than the guidelines recommendation. That's very interesting. But when you drill down, should we think about that delta differently when we're dealing with such an unusual guideline? Yes. And I think one of the things you might consider under 3553A or when analyzing the guideline and how much reliance you want to put on it, you might want to consider some of the other factors that might apply, such as criminal history category. My client was in criminal history category one. So many defendants who commit a 924C brandishing offense might have a category three or a five. He was criminal history category one. And I agree that that inures to his benefit. What about his conduct immediately after the shooting? Is that something the court can consider? Lying to the police about whether the car was in his possession? This went presumably uncharged or, according to the government, unresolved for many years. Is that something the court can consider, the trial judge can consider, the fact that he lied about his involvement, that he was the driver of a getaway car, and basically what amounts to be an execution-style murder? Well, absolutely the court may consider my client's lie to law enforcement. And there was an eight-year delay in prosecution. So he got 120 months, and the guidelines were 84 to life, correct? No, the guidelines were 84. 84. But the court could sentence up to life, correct? The statutory maximum is life. Okay. So I guess I'm struggling under the totality of the circumstances, how 120 months, when the statutory minimum was 84, right? Was that? Yes. Okay. And the maximum was life. How that was substantively unreasonable beyond he was a criminal history 1. Well, then I think you need to dig down into the facts of the individual and of the crime. So I've already mentioned that he's in criminal history category 1. He had one criminal history point. He was 21 years old at the time of the offense. He used his mother's car with his mother's license plate. So obviously an individual at the age of 21 doesn't have the maturity. They don't have the forethought. They don't have the impulse control to control their actions as much as an adult does. What about his conduct in the interim, the eight years? Can the court consider that? After the lie to the police, it was very good. And, of course, that can be considered as a 3553A factor. He had an auto detailing business. He was buying and selling used cars. He didn't have any criminal history, was he? Nothing after. He had an attempted criminal possession of a weapon at age 18, and then this offense occurred when he was 21. I would like to mention the fact that he's five years younger than the co-defendant. He's convicted here, and he pleaded guilty to aiding and abetting the brandishing of a firearm. So I know the court can consider the actual facts of what occurred, but that's all he was convicted of. The co-defendant had a reputation as a drug dealer. He sold drugs in the building where my client lived, but he didn't have a reputation for violence. But I think it's undisputed. My read of the record was, and tell me if I'm wrong, that it was undisputed by your client that he knew there was a gun and undisputed by the government that he didn't know specifically that the intent was to murder Mr. Perez. Is that? Precisely. And also the government did not contend that he knew the gun would be even discharged. Well, he didn't plead to discharge, right? That's a 10-year amendment. But not only did they not say he had advanced knowledge of a murder, he didn't have advanced knowledge that a gun would be discharged. He was a 21-year-old being asked by a 26-year-old who lived in his building to drive a car on a particular night. So assuming for the sake of argument that any one of the three of us, if we were sitting as sentencing judge, would have given him the man-man, the seven years, given the standard of review here, remembering that the difference is not between 24 to 30 months and 10 years. The difference is between seven-year man-man and 10-year actual sentence. How do we deal with the very generous deferential abusive discretion standard here? There's no mathematical formula, but one thing I would ask for your honor to consider, that the guideline sentence was exactly seven years. Half of that would be three-and-a-half years. The judge went almost half of the sentence above. In departing above, he went to 140 to 150 percent above, your honor. Thank you, counsel. You've reserved some time for rebuttal, so we'll see you again. We'll hear from Mr. Laureano's counsel now. You also have reserved two minutes for rebuttal, so you have five minutes now. Thank you, your honors. Good morning, your honors. Michael Bachrach for Defendant Carlos Laureano. For Mr. Laureano, much like his code of co-appellant, this appeal is very straightforward and simple. But for Mr. Laureano, it's even more so. A sentence of 15 received, in this case, a sentence of 15 years above his guidelines, 15 years above the appellate waiver, and 15 years above the recommendation from the probation department. In this case, that is so shockingly high that it is substantially unreasonable. What if he had ‑‑ so first, as a matter of record, I think, these folks were both charged with a death-eligible crime at the outset. Is that right? They are, yes, your honor. Okay. So if he had ‑‑ so he pled to ‑‑ we're going to focus just on count one, right, which is the one related to the murder, setting aside that five‑year extra. The conduct to which he stipulated and which is not objected to in the PSR, looked to me like it could have been sufficient to sustain a conviction for a murder, at least in the second degree. Your honor, I think it would be fair to say that had it gone to trial, the government would have had sufficient evidence to establish a 924J conviction had they wanted it, if not an 848E conviction, again, had they sought it. But I think it's important to take note that the evidence wasn't perfect. There were flaws in it. And that is why the government chose, and it's, of course, the government who has all the power as to what to offer in a plea agreement, the government chose not to have him plead to the superseding indictment, which charged 924J and 848E, but instead to a superseding information that allowed him to plead guilty solely to a 924C count with a substantially lower guideline range. Well, and a substantially lower mandatory, like he had a mandatory minimum. There was no mandatory life on the table anymore at this point, right? There was no mandatory life on the table. And there was no death penalty on the table. Well, first of all, the death penalty was taken off the case prior to the plea. That was an earlier decision by the attorney general. Yes, but those are being revisited, so who knows. Well, so far, every court that has ruled on it has said that they can't revisit it. There are seven decisions right now across the country that have said that consistently. Okay. With respect to the mandatory minimum, there's a misstatement there. 924J has a mandatory minimum of five years. 848E does not have a mandatory minimum. Okay. Well, counsel, what I'm asking about is sometimes when we see a case and we think this guidelines range is not quite what it should be, and you have cases like Dorvey that say this guidelines range is unusual and it's way too high. Here, the conduct, if it were evaluated on its own, would have supported a guidelines range squarely at where he was sentenced. His guidelines would have been 360 to life had he pled guilty or been convicted of the counts of a superseding indictment. That's absolutely true, Your Honor. But, again, the government chose to have him sentenced not on those counts but instead under guidelines of simply a straight 15 years, 180 months. That's the government's choice. The government's control over what to plea, and because of it, they have to live with that bargain. Right, but the plea agreement didn't restrict their – it wasn't 11C1C. It didn't restrict their ability to seek a higher sentence, right? It didn't, but it changed the starting point, Your Honor. And under Supreme Court and Second Circuit case law, the starting point is the guidelines, and it remains the guidelines even in a case such as this. So the government chose to go to sentencing, at first a plea and then at sentencing, with an intentionally lower guideline starting point than they would otherwise. And this Court has held that – excuse me, the Supreme Court has held that it's uncontroversial that a major departure should be supported by more significant justification than a minor one. And this – and as well that the Court must consider the extent of the deviation and ensure that justification is sufficiently compelling to support the degree of the variance. So we start – regardless of what it would have been at trial, regardless of what it would have been at the unconvicted charges, on the count of conviction, your starting point is 180 months. So let me ask the same question I asked your colleague, which is should we, and if so, how should we, view a 924C, this weird guidelines range that's not a range? Your Honor, I think you actually have to view it the way you would any other guidelines. Congress put – and I disagree with my – the co-appellant on this one. Congress chose what the – not Congress, excuse me. The Sentencing Commission chose what the guidelines would be for the various different offenses. And this was one of them. And the variable that has happened here was a possibility when it outlined that for a 924C discharge, it would still be a 10-year mandatory minimum for that offense. Congress knew it. So, yes, this may be a case where the underlying facts are a little unique, but not so unique to warrant a 100 percent increase in the sentence, which is what occurred here. But you're calling it a 100 percent increase in the sentence. At plea, your client understood, and that was part of the plea agreement, that the government would seek a higher sentence than the 180. Yes. And that the court could give up to life, correct? Your Honor. And is the court precluded from considering the underlying facts in this case, which involve – and your client agreed to these facts, walking behind the victim, shooting him point-blank in the head, and then shooting at his pregnant girlfriend. He pled to those facts, right? So I'm struggling with under our standard of – he pled to shooting the victim. Yes. Okay. But there was evidence that the pregnant girlfriend was shot at. He was firing at the victim. She was standing there at the same time. But there was evidence that could support he was firing at either of them. He's the only shooter, correct? Correct. Under those set of facts, including his significant criminal history, under our standard of review, how are we to say that giving him 360 months was too much? Because his guideline range, his starting point, was 180 months, your Honor. But that's a starting point. You just said it. That's the starting point. It's not the end point. So we're focused on the end point here, right? Yes and no, Judge, because when you have to start, you still have a starting point. So when you're evaluating where the end point is, you have to evaluate the deviation. That's what the Supreme Court said in Gall. And you have to have a significant justification for it. So, yes, if we were here and the sentence was 20 years as opposed to 30 years, if it was only a five-year increase as opposed to 15, obviously the argument I think the appellant would have would be much more difficult. But here we're talking about a full, complete, 100 percent increase, sentencing him more than defendants in similar situations with more aggravating facts have received, as I cited to you in my brief. I'm sorry. I see I'm over time. All right. Thank you, counsel. Unless anyone else has questions, we'll see you again on rebuttal. Thank you, Your Honor. We'll hear now from the government. And, counsel, it might be helpful to give us some principles that apply generally here, and then you can respond to, or in either direction, and also respond separately to the two defendants' arguments. Certainly, Your Honor. Thank you. May it please the Court, Jacob Fiddleman for the United States. I represent the government on this appeal, although I was not involved in the district court proceedings below. Neither defendant's sentence is substantively unreasonable. This Court's review here is to provide a backstop to reverse only those sentences that are shockingly high and cannot be supported as a matter of law. That simply is not the case for either defendant's sentence. I was shocked to see it double the guidelines. I mean, you know, when I do my initial quick look, I thought, you know, as I sort of mentioned to your colleagues here, wow, I never see these substantive reasonable challenges to such an extreme difference. Why is that not shocking in and of itself? Because the question is whether the sentence imposed is shocking in light of the entire 3553A factor mix. And so in this case, I'll address Mr. Luriano, but the point, as Your Honor mentioned at the start, applies to both, which is there's something unusual with respect to 924C-only dispositions. Now, the government thinks that the 3553A analysis with respect to the guidelines is the same for 924C-only cases. Namely, the guidelines are a starting point. And then the Court can and must consider any way in which the individual facts and circumstances warrant a sentence of, you know, above or below or different from the guidelines starting point, as Judge Kahn called it. So in this case, the guidelines were either 7 years or 15 years, but that's the starting point. As Your Honor mentioned at the very beginning of the argument, Judge Merriam, the guidelines recommendation in neither case captured the defendant's criminal history, the actual conduct they engaged in, or any of the mitigators or aggravators that the guidelines otherwise capture. And so Judge Lyman was well within his discretion in noting that, in pointing out that there are serious aggravating circumstances here with respect to the actual conduct. There are serious aggravating circumstances with respect to criminal history. As to Mr. Luriano? Frankly, as to both, Your Honor. Certainly, Mr. Luriano had a very serious criminal history. He was in Category 6. He had serious drug felonies before and after the murder. But Mr. Ben-Yochanan had a prior firearm conviction from several years earlier, as to which he was still on probation at the time of this murder. And that also was reasonable for the district court to consider, even if it only resulted in one criminal history point and left him in criminal history Category 1. It goes directly to the 3553A factors. The conduct here was egregious. It was a premeditated, as to Mr. Luriano, premeditated execution-style first-degree murder by shooting a suspected drug robber in the back of the head while he hugged his pregnant girlfriend. Simply put, a 30-year sentence for that conduct is not shockingly unreasonable. And that's the test for this court. Well, it's 25 for that conduct, right, actually? Because it's a five-year mandatory consecutive on the second count. I think it's fair to say a 30-year sentence for the combination of that conduct and then continued gun possession in connection with his continued drug-dealing later does not shock the conscience. Judge Lyman reasonably pointed out, in fact, that a relevant data point in addition to the actual guideline sentence was 2A1.1, which is the guideline that typically applies to these facts premeditated murder. And in that guideline, the applications note says that life imprisonment is typically the appropriate sentence for a premeditated execution. And so Judge Lyman considered that. He didn't impose a life sentence, but he considered it as a relevant data point along with the statistics which we cite in our brief on page 25 and 26 with regard to what sentences are imposed in first-degree murder cases. So we submit that Laureano's 30-year sentence simply does not shock the conscience. With respect to Mr. Ben-Yochanan, the same logic applies. What Judge Lyman essentially found here was something akin to felony murder, right? The parties agreed and the court found that Mr. Ben-Yochanan knew and intended and aided and abetted a drug-related brandishing of a firearm at someone suspected of robbing Mr. Laureano, who he knew was a drug dealer. It then turns out, though it may not have been specifically intended, it was well within the reasonably foreseeable possible results that that ended up killing someone, that the gun was discharged and that the victim died, right? Judge Lyman reasonably said this is like felony murder. And felony murder under the guidelines, typically under 2A1.1, the murder guideline is applied and then the commentary says you can depart or vary downward as the case may be based on the individual defendant's lack of intent to kill. Here, Judge Lyman reasonably considered the entirety of the facts and circumstances and he concluded that particularly where the defendant concealed the offense and lied about it right afterward and the prior firearms conviction that he had, a 10-year sentence over a 7-year guidelines range was reasonable. And that, too, does not shock the conscience based on the totality of the circumstances. One very brief moment, which is Mr. Laureano mentions emphatically the structure of the plea agreement and the probation recommendation and the appellate waiver. There could be no reasonable expectation from the terms of the plea agreement and the allocution that the court might not have imposed the sentence that it did. It was specifically allowed, the government was allowed to argue for it. Well, that it's allowed is not, I have no doubt that it came as a genuine shock to the people in that courtroom that the sentence was 30 years on an 18-year, on a 15-year amendment. Respectfully, Your Honor, I disagree. It's what the government had asked for in its papers and the defendant was specifically allocated at the plea. This document is a contract between you and the government. It does not bind the court. The court is going to consider all the 3553A factors and could sentence you anywhere up to life. Every plea agreement says that, right? Yeah. We understand that. But which specifically eliminates sort of idiosyncratic reliance on what you might think your sentence is going to be. The bottom line is he knew that he pled to a premeditated execution. And so the main point I wanted to mention was with respect to the appellate waiver, the fact that the government agrees not to appeal above a certain point cannot bind the district court. The only relevant factor there would be the sentencing guidelines. And the court reasonably considered the guidelines as a starting point here. So unless the court has any further questions. Just help me with, I'm sorry, were you, the only relevant factor to what is the sentencing guidelines? I'm sorry. The only factor relevant to the court's 3553A analysis that flows from the structure of the plea agreement is the sentencing guidelines that resulted from the count of conviction. The fact that the government agreed to not appeal in certain circumstances has nothing to do with the 3553A factors. So I think this argument is, I'm not sure how it fits into a substantive reasonableness argument, but you do hear this here, and it is an interesting question, that I think from Mr. Laureano's perspective and maybe Mr. Ben-Yohanan's perspective, it feels a little, I think one of them calls it a bait and switch. It feels, well, give me a second. It feels like the government says, we're giving you this huge break, right? We're going to dismiss the indictment and we're going to let you plead to this lesser count. And so you should give up your trial rights. And they feel like the, everybody knows that every plea agreement says, of course you can get up to the statutory maximum, but it just feels not quite right. And I understand that, but I guess my question for you is, does that sense of a bait and switch or a sense of the idea that it misled their clients, whether or not that's fair, does that play into a substantive reasonableness assessment at all? Or are we looking solely at the sentence itself and not at the expectations of the parties? So two things, Your Honor. First, I think we're looking solely at the sentence itself and not the expectations of the parties. But second, we emphatically reject the notion that it feels wrong or seems like a bait and switch or that it would be reasonable for a defendant to feel that way. The terms of these plea agreements were specifically structured so that the mandatory minimum was lowered, which is a major benefit, and the guidelines starting point was lowered, which is a major benefit, equipping the defendants to be able to argue for a sentence below what the amendment otherwise would have been, benefited by the fact that the starting point was also lowered. But that has nothing to do with sort of high-end risk capping. The structure of this plea agreement contains no risk cap, no cap on the high end from a risk abatement perspective. And some plea agreements do. Oftentimes, murder defendants will plead to plea agreements that involve a cap on the statutory maximum. Right, they could have pled to a drug charge instead. He could have asked to plead to a drug charge instead. He could have, you know... Oftentimes, there's a structured arrangement where there's a 30-year cap, and in those circumstances, the guidelines are usually the 30-year cap. And so a defendant starts from the top at 30 and has to argue down. They chose to have the chance to start from the bottom and argue up, but they had no upside cap, and that is exactly what they knew they were agreeing to. Let me ask you one last question just about the... You agreed that 924C is sort of unique in terms of the way the guidelines work. Mr. Ben-Yohanan has no criminal history. He has one criminal history point. He is in criminal history category 1. And his guidelines under many things would have been lower. How do we account for that? So I don't think his guidelines would have been lower. If he had pled to the conduct, aiding and abetting, essentially felony murder, right? Any other statute that had anything... Well, but the record here doesn't say that he has agreed that he knew there was going to be a murder. No, no, felony murder. Okay, so just that he agreed... He agreed that he knew it was to collect a drug debt. Is that sufficient? He knew that he was helping a drug dealer brandish a firearm at a rival drug dealer in connection with the drug business, yes. And so it's well within the reasonably foreseeable results that someone will die when that happens. And so absent the 2K2.4 pinning of the man-min as the guidelines range, any other guideline that applied would have reflected his actual conduct, would likely have included a cross-reference to premeditated murder as a felony murder, and then there would be an application note that said the judge should depart or vary downward from life to capture the lesser intent and culpability of the defendant. All right. Thank you very much. Thank you, counsel. We'll hear from defense counsel again. You have two minutes each, beginning with Mr. Yunella. When you consider whether the parties were shocked or not, David Tauger said at sentencing that he'd been practicing law for 36 years and he hadn't seen an upward departure from a 924C offense. It's a variance, but your colleague for the government argues that we should consider the actual sentence and not the expectations of the parties. How do you respond to that? But you are required to decide whether the sentence actually imposed was shocking. To whom? To us or to the parties? To the court's sense of justice, considering the individual involved in the case, the nature of the offense, the specific guideline, the degree of the departure. Well, let's take the nature of the offense and the way he behaved after. So even if your opponent says, and I think there's law supporting, that if you enable someone, you drive someone, you're the getaway driver and you know he has a weapon and that it's loaded and he's going to confront something, someone about a deal gone bad, that it's reasonably foreseeable that somebody is going to get shocked. But leave that aside. His conduct after, I'm struggling to find how it's so shocking that the court, he was looking at a seven-year mandatory minimum. The court gave him 10 years, three years more. Given the circumstances of this offense and his conduct in lying to the police, assisting in hiding the instrumentalities of the crime, how is that so shocking? I want to apologize because I used the word departure again and this is an upward variance. It's shocking, Your Honor, given his age, when the two older co-defendants jump in the car panting and tell him to drive, drive, drive. And then one of the co-defendants threw the gun out of the car during the drive back. So my client didn't come forward and tell the truth about what occurred. Well, you know, maybe he's scared at the moment. And the court, I think the trial judge talked about this. He could have gone the other way, like, oh, this has really gone bad. He could have gone to the government and said, look, I didn't know this was going to happen. You know, I didn't know this guy was going to do this. But I'm scared. I need protection. I mean, there are many things he could have done other than lie to the police for eight years. That's true, but think of the sentence imposed. What Your Honor said is absolutely true. But does that justify a 10-year sentence for a 21-year-old who drives his mother's car under circumstances where the case is almost, is certainly going to bounce back on his mother then eventually on him? Does it justify a 10-year sentence, that much of a variance from the guidelines? Three more years? I'm not saying it's, we're not asking for, we couldn't ask for three years or five years or seven years is the guideline sentence. That's a long time for, that's a long time for a 21-year-old. Thank you, Counsel. And we'll hear from Mr. Bachrach. Again, Your Honors, the government and the defense actually agree on something. It's nice to see. And in fact, I think the court agrees on it to a certain extent, too. What matters here is you only look at the sentence. That's what they're saying. You look at the sentence. That means you don't look at the maximum possible potential sentence, the statutory maximum, which in so many cases, by the way, is life. You look at what are the guidelines, and what is the deviation from the guidelines? So we look to the minimum, but not the maximum. No. We don't look? Your Honor, the minimum is what the minimum is, meaning the judge can't go below that. That's what the minimum is. The maximum is he can't go above that. If this was a 924C... Okay, and the difference is, try to help me understand how the court should only look at the minimum and not... So those are the outward limits of what the offense is. That's not your starting point. That's the outward limits, no matter what the case was. So if this was truly one of the worst of the worst cases, we would be in a different situation. But the court and the government both acknowledge this is not one of the worst of the worst cases. The court and the government acknowledge that Mr. Luriano was indeed remorseful. The court and the government acknowledge that there was substantial mitigation in this case. These are issues that were not in dispute, Your Honor. If it was a regular 924C case with just a simple possession and nothing more, the minimum would be five, and the maximum would still be life. You don't consider the minimum, the maximum, except for the fact that that's the outer boundaries of what's allowed. You still have to start with the starting point, which there would be five years. Here, the starting point is 15 years. But that's the starting point. And what the judge then did was he varied upwards 15 years. A hundred percent, he doubled the sentence. It's 10 years, right? Because this is, I know this is maybe a detail, but he's got a five-year man-to-man consecutive on count two. So he varied upwards, no, because the guidelines are still for 880 months, because you still have to consider the guidelines. So it's a 15-year... Right, five plus 10 is the guidelines. Correct. So it is a 15-year upward variance. Okay, from the 10-year guideline for the murder to the... From the aggregate guidelines of the two offenses combined, which is how you have to calculate it for a 924C offense. But the total sentence on the count one, the count that relates to the murder, is 25 years plus five years for the sort of more traditional 924C. Correct. So under that circumstance, he actually went up 150 percent on the murder count, not 100 percent, and then did a tack-on of an additional five years.